United States District Court
Southern District of Texas
**ENTERED**
June 07, 2018
David J. Bradley, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DANIEL ALEJANDRO ALANIS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:16-cv-190 |
| | § | |
| CITY OF BROWNSVILLE, et al., | § | |
| Defendants. | § | |

### MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

The Court is in receipt of "Defendant Antonio Martinez's Motion for Summary Judgment" and "Defendant City of Brownsville's Motion for Summary Judgment" (hereinafter, "Martinez's Motion" and the "City's Motion"). Dkt. Nos. 18, 19. It is recommended that Martinez's Motion be **DENIED** and the City's Motion be **GRANTED**.

### I.      Background and Procedural History

Plaintiff Daniel Alejandro Alanis filed this civil action against Defendants on July 28, 2016. Dkt. No. 3. He asserts that the City of Brownsville (the "City") and Antonio Martinez, a detention officer formerly employed by the City, should be held liable for an alleged instance of excessive force that occurred while Alanis was being moved into a holding cell at the city jail. Defendants filed separate motions for summary judgment on October 16, 2017. Dkt. Nos. 18, 19. Alanis responded to the motions on November 6 and 7, 2017. Dkt. Nos. 21, 22. Defendants replied on

November 22, 2017.  Dkt. Nos. 27, 28.  Alanis filed a sur-reply on December 11, 2017.  Dkt. No. 32.

## A.  Facts alleged by Alanis

On February 20, 2015, Alanis and his brother had a minor physical altercation at home.  Dkt. No. 5 at 3.  Alanis sustained a bloody nose, and his brother a bloody lip.  *Id.*  Alanis called the police.  Dkt. No. 21 at 7.  He acknowledges that he was "high on drugs" at the time.  *Id.*  Three Brownsville police officers—Officers Viviana Trevino, Victor Mendez, and Antonio Martinez, Jr. (not to be confused with Defendant Antonio Martinez)—investigated the incident at the Alanis residence.  Dkt. No. 5 at 3.  Having been told by a housemate that Alanis was being "necio"[1] all day, the officers arrested Alanis for assault, a class "A" misdemeanor.  Dkt. No. 5 at 3, Dkt. No. 21 at 7, Dkt. No. 20-11.  The officers patted Alanis down, handcuffed him, and secured him by seatbelt in the back of a patrol car, all "without incident or resistance."  Dkt. No. 5 at 3.  Mendez drove Alanis to the Brownsville Police Station and Municipal Jail.  *Id.*  Along the way, Mendez radioed the police dispatcher to ask for a jailer to assist with bringing an "aggressive individual" into the jail.  Dkt. No. 21 at 7.

Once Mendez's car arrived at the station, Officer Martinez, Jr. and four other officers walked Alanis, who was still handcuffed from behind, toward the jail

---

[1] The undersigned is bilingual and takes the use of the Spanish term "necio" in this context to mean that Alanis was being feisty throughout the day.

building's sally-port.[2]  Dkt. No. 5 at 4; Dkt. No. 21 at 8.  Defendant Martinez was

waiting for the group at the sally-port door, having been informed that help was

needed in moving an individual into the jail.  *Id.*  Alanis alleges that:

> Defendant Martinez grabbed plaintiff in a rough manner by the arm,
> causing plaintiff to recoil and turn back toward Officer Martinez, Jr.
> Suddenly defendant Martinez put plaintiff in a bear-hug, lifted him off
> the pavement and dragged him through the doors and into the first cell
> on the left.   There, without stopping and with all his weight and
> momentum, defendant Martinez drove plaintiff into the back wall of
> Cell 114 and then slammed him face-first onto the floor.   Plaintiff
> howled in pain, his left hip socket was shattered.

Dkt. No. 5 at 4–5.  In his responsive briefing, Alanis also describes the

sequence of events as follows:

> Police officer Martinez pushed Alanis toward Defendant Martinez,
> causing Alanis to say something to the police officer.   Martinez took
> ahold of Alanis' right bicep and forcefully steered him toward the door.
> Alanis quickly turned back toward the police officers who were
> following in queu.  Defendant Martinez never lost his grip on or control
> of Alanis.   Yet without any attempt to de-escalate the situation,
> Martinez bear-hugged Alanis and lifted him so high that several police
> officers reported that Alanis had jumped, and that Martinez caught
> him in mid-air.  Martinez carried and dragged Alanis through the two
> doors, then forced him left into the padded cell.   Inside the cell,
> Martinez braced himself and drove Alanis into the wall.   While on his
> knees, Martinez twisted Alanis and slammed him face down on the
> floor.  Alanis howled that his leg was broken.

Dkt. No. 21 at 8–9.  Alanis alleges that he lay on the ground of the cell by

himself for over an hour, "in agony," before being transported to an area hospital.

Dkt. No. 5 at 5.  Subsequent scans showed Alanis to have a "comminuted posterior

wall" fracture and "an extremely comminuted posterior column fracture involving

most of the width of the column."  Dkt. No. 5 at 5; Dkt. No. 21 at 9; Dkt. No. 24-18.

---

[2] A sally-port "is a secure area at the rear of the jail where incoming prisoners are unloaded and
escorted into the building for booking."  *Brothers v. Klevenhagen*, 28 F.3d 452, n.1 (5th Cir. 1994).

Alanis states that "[t]he CT report called it a 'posterior blowout fracture of the left acetabulum, which usually result from high velocity car accidents or falls from significant heights.'"  Dkt. No. 5 at 6.  Four days after being injured, Alanis was taken into surgery "on an urgent basis" to repair the fractures, and two weeks later, he was released from the hospital.  *Id.*  The police department conducted an internal investigation and found that no excessive force had been used during the incident. Dkt. No. 20-11.

Alanis filed suit against Martinez pursuant to Title 42, United States Code, Section 1983, "for violating his Fourth and Fourteenth Amendment rights to be free of unreasonable seizures and not punished without due process."  Dkt. No. 5 at 9. He also raised a claim against the City, alleging, among other things, the existence of "a custom, pattern and practice of detention officers at the city's jail using excessive force, and specifically using the walls and floor of Cell 114 to exact punishment before the detainees have been convicted or, as here, even formally charged."  *Id.* at 6–7.

### B.  Facts alleged by Defendants

Martinez's Motion relays many of the same facts alleged by Alanis, but with key distinctions.  Dkt. No. 18 at 7–12.  Martinez asserts that Officer Viviana Trevino, after conducting an investigation, determined Alanis had been the primary aggressor in a fist fight with his brother.  *Id.* at 7.  While being transported to the city jail in the police car, Alanis reportedly became angry and was acting "aggressive and combative."  *Id.* at 8.  He reportedly shouted "Get on the ball!" and

began kicking the window of the police vehicle.  *Id.*  Defendants also assert that Alanis was "hollering" in the vehicle: "This is nothing!  Just wait and see what I'm going to do next!"  *Id.*  Martinez asserts he took hold of Alanis's shoulder at the sally-port outside the jail, and then "Alanis twisted his body, jerking away from him, and began mouthing loudly at the officers following behind in the driveway." *Id.* at 9.  Further, "[t]he interior door into the jail . . . was closing, so in order to maintain control of the situation, Jailer Martinez placed his left arm around Alanis and drew him close to his body, so the exterior door did not close on his face."  *Id.* At that point, "Martinez lifted him slightly from the ground, and carried him into the jail facility through the interior door."  *Id.*  Once inside, "Martinez did not release [Alanis] because he was pulling away from Martinez; and Martinez had not yet searched him for weapons."  *Id.* at 11.

Most crucially, Martinez's Motion contends that the collision against the wall was an accident that occurred after Martinez lost his balance in the cell doorway while attempting to move Alanis into the cell.  *Id.*  According to Martinez, his legs became entangled with Alanis's in the cell doorway, causing the loss of balance.  *Id.* Martinez states that he and Alanis both fell head first into the wall.  *Id.* at 12.  He also argues that Alanis contributed to the accident by struggling against his hold and continuing to resist during transit to the cell.  *Id.* at 11.  Martinez asserts that "Alanis can be seen in the videos struggling against Martinez's hold, and his feet spread out."  *Id.*  Upon falling to the floor, Martinez states that he "secured [Alanis] in a prone position to search him for weapons."  *Id.* at 12.

## II.    Legal Standards

### A.  Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A court shall grant summary judgment if the movant demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *see Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).  The initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'"  *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992)).  If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial.  *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001).  A fact is material if its resolution could affect the outcome of the action, and a disputed material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *DIRECTV Inc. v.*

*Robson*, 420 F.3d 532, 536 (5th Cir. 2005).

"There is a genuine dispute of material fact only where a reasonable jury could look at the evidence and return a verdict for the non-movant." *Johnson v. Thibodaux City*, 887 F.3d 726, 735 (5th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether a genuine issue of material fact exists, the facts are viewed in the light most favorable to the non-moving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). "It is not the court's role on summary judgment to weigh competing evidence or make credibility determinations." *Grogan v. Kumar*, 873 F.3d 273, 280 (5th Cir. 2017). Factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'" *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999)). The non-movant's burden is not satisfied by mere reliance on the allegations or denials in its pleadings. *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994). Likewise, conclusory statements, speculation, and unsubstantiated assertions do not defeat a motion for summary judgment. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *see also Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).

If the non-movant fails to refer to evidence in the record in response to the motion for summary judgment, even if it exists, that evidence is not properly before

the district court.  *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).  In the absence of proof, the court will not assume that the non-movant could or would prove a necessary fact.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).  Rather, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the court may "(2) consider the fact undisputed for purposes of the motion; [or] (3) grant summary judgment if the motion and supporting materials - including the facts considered undisputed - show that the movant is entitled to it[.]"  FED. R. CIV. P. 56(e).

## B.  Qualified Immunity

Qualified immunity "shield[s] [government agents] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (alterations in original).  This immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "When resolving qualified immunity on summary judgment, courts must determine (1) whether the facts, taken in the light most favorable to the party asserting the injury, show the officer violated a federal right and (2) whether the right was 'clearly established' when the violation occurred." *Winfrey v. Rogers*, 882 F.3d 187, 197 (5th Cir. 2018).  "Once the defense is raised, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to

whether the official's allegedly wrongful conduct violated clearly established law." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). The plaintiff need not "present absolute proof" to defeat an assertion of qualified immunity, "but must offer more than mere allegations." *Id.* (quoting *King*, 821 F.3d at 652). Courts must continue to view all evidence in the light most favorable to the non-movant. *See, e.g.*, *Chacon v. Copeland*, 577 Fed. Appx. 355, 360 (5th Cir. 2014) (per curiam). "[Q]ualified immunity presents a question of law to be determined by the court," but "'when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury.'" *Heaney v. Roberts*, 846 F.3d 795, 802 n.3 (5th Cir. 2017) (citing *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006). "[O]rders denying qualified immunity are immediately appealable only if they are predicated on conclusions of law, and not if a genuine issue of material fact precludes summary judgment on the question of qualified immunity." *Naylor v. State of Louisiana, Dep't of Corrections*, 123 F.3d 855, 857 (5th Cir. 1997) (per curiam). A genuinely disputed fact is material if a determination of qualified immunity would require that fact's resolution. *Lytle v. Bexar Cty.*, 560 F.3d 404, 408 (5th Cir. 2009).

"In order for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987). Although this does not mean that "a case directly on point" is required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131

S. Ct. 2074, 179 L.Ed.2d 1149 (2011). "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc)). What is required "to overcome a claim of qualified immunity . . . [is] not that the specific police action [has] been held unlawful, but only that it be apparent 'in the light of pre-existing law' that such action would be unlawful." *Wagner v. Bay City*, 227 F.3d 316, 323 (5th Cir. 2000) (citing *Anderson*, 483 U.S. at 640).

### III.  Discussion

"Section 1983 provides a claim against anyone who 'under color of any statute, ordinance, regulation, custom, or usage, of any State' violates another's constitutional rights." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). To prevail on a § 1983 claim, the plaintiff must show that the defendants (1) violated a constitutional right, (2) while acting under color of state law. *Moody v. Farrell*, 868 F.3d 348, 351 (5th Cir. 2017). Section 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred elsewhere." *Colson v. Grohman*, 174 F.3d 498, 405 n.2 (5th Cir. 1999).

### A.  Martinez's Motion for Summary Judgment

### *1.  Whether Alanis was an arrestee or pretrial detainee*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). The parties dispute which constitutional right is at issue in this case.  Alanis argues that he was an arrestee at the time of the incident, protected from excessive force by the Fourth Amendment's prohibition on unreasonable "seizures."  Dkt. No. 21. Martinez argues that Alanis was a pretrial detainee whose claim implicates the substantive due process clause of the Fourteenth Amendment.  Dkt. No. 18.

Though "the Fourth Amendment protects arrestees, once an arrest is complete, pretrial detainees are protected by the due process clause of the Fifth or Fourteenth Amendments."  *Gutierrez v. City of San Antonio*, 139 F.3d 441, 452 (5th Cir. 1998).  "The Fourth Amendment is inapplicable to a pretrial detainee who was properly arrested and is awaiting trial."  *Brooks v. George Cty., Miss.*, 84 F.3d 157, 167 (5th Cir. 1996).  However, "the point at which an arrest ends and pretrial detainment begins is not always clear[.]"  *Gutierrez*, 139 F.3d at 452.  Since the Fourth Amendment "protects against unreasonable 'seizures,' it seems primarily directed to the initial act of restraining an individual's liberty, such as an investigatory stop or arrest," but the Fifth Circuit has consistently held that its protection "does not end the moment the police gain custody and control over a suspect." *Valencia v. Wiggins,* 981 F.2d 1440, 1443–44 (5th Cir. 1993).  Instead, in

*Valencia v. Wiggins*, the Fifth Circuit provided three conditions to be considered when drawing the line between arrestee and pretrial detainee; specifically, that an arrestee has become a pretrial detainee "*after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time." 981 F.2d 1440, 1444 (5th Cir. 1993) (emphasis in original). "It is only after these three circumstances occur that an arrestee, who was protected from excessive force under the Fourth Amendment, becomes a pretrial detainee who is protected under the Fourteenth Amendment." *Jones v. McIntosh*, No 4:15-CV-4462016, 2016 WL 4430481, at *5 (E.D. Tex. Aug. 22, 2016).

Revisiting the issue in *Brothers v. Klevenhagen*, the Fifth Circuit held that a decedent was a pretrial detainee at the time of his death, where he had been arrested, processed, detained for several hours in a station house jail cell, and then shot during transfer to a separate facility. 28 F.3d 452 (1994). Explaining its decision, the court reasoned that "[o]nce an individual has been arrested and is placed into police custody, and surely after the arresting officer has transferred the individual to a jail cell, the individual becomes a pretrial detainee, protected against excessive force by the Due Process Clause." *Id.* at 457 (emphasis added). The court also stated:

> Although [Fourth Amendment] protection may extend beyond the time of initial apprehension, Brothers had been arrested earlier in the day, *had been processed* by the Jersey Village Police Department, and had spent several hours in jail. He was being transported to the county jail, his hands cuffed and his legs restrained. It is difficult to imagine how Brothers could not be considered a detainee at that point."

*Id.* at 456 (emphasis added).   Notably, the court continued to apply the *Valencia* conditions to reach its conclusion, holding that (1) the incidents of Brothers' arrest were complete, (2) that he had been released from the arresting officers' custody, (3) and that he "already had been in detention" at the time of the incident. *Id.*

Here, because the three *Valencia* conditions were not yet satisfied, Alanis was an arrestee whose excessive force claim arises under the Fourth Amendment. First, while Alanis had been arrested, it is debatable whether the "incidents of arrest" were complete.   *See Gay v. James*, No. 3:11-CV-2998-G, 2012 WL 1945618, at *4 (N.D. Tex. May 30, 2012) (holding that the "incidents of arrest were not completed," because the book-in process was still ongoing).   Alanis was never booked into the jail.   Dkt. No. 23-1 at 223.   That the pretrial detainee had been processed was a fact expressly mentioned not only in *Brothers* itself, but in subsequent Fifth Circuit precedent reviewing the *Brothers* decision.   *Gutierrez*, 139 F.3d at 453 ("Thus, in *Brothers*, we found Brothers to be a pretrial detainee protected by the Fourteenth Amendment where he had been arrested, *processed by the police department*, and spent several hours in jail before the police allegedly used excessive force on him.") (emphasis added).   Defendants have raised no binding authority to indicate that an arrestee may be treated as a pretrial detainee without first being processed and booked into the jail.

Second, while Alanis was in Martinez's physical hold at the time of the alleged excessive force, he had not yet been released from the arresting officers'

custody. Under the City's jail procedures, arresting officers retain responsibilities for their arrestees up until the time of booking. *Compare* Dkt. No. 20-4 at 40–41 ("In the event during the booking process, a prisoner becomes violent, it will be the responsibility of both the officer and the jailer to restrain the prisoner . . . . When booking prisoners to the City Jail, the arresting officer will remain with the prisoner until the prisoner is placed into a cell."); *and id.* at 41 ("Jailers who observe an injury to a prisoner before the booking procedure begins, will request the arresting officer take his prisoner to an emergency medical treatment facility for an evaluation"); *with id.* at 42 ("After a prisoner has been booked, and the Jailer observes an injury to the prisoner and/or the prisoner complains of a physical ailment, the Jailer will advise the Shift Commander[.]"). At least one other court has held that arrestees are not yet released from the custody of arresting officers when the book-in process is incomplete, and therefore, the Fourth Amendment is still applicable during that period. *Jackson v. Partington*, No. 3:14-CV-0360-B-BH, 2015 WL 7566291, at *4 (N.D. Tex. Nov. 9, 2015). Such is the case here. Additionally, Alanis has alleged that the arresting officers were following closely behind Defendant Martinez when Alanis was injured in the cell, supporting the notion that Alanis, though in Defendant's physical hold, was still in his arresting officer's formal custody. Dkt. No. 21 at 13; *see Gay*, 2012 WL 1945618, at *4 (N.D. Tex. May 30, 2012) (holding that an individual was still an arrestee where arresting officers handcuffed him to a bench in the book-in room and were present while other officers allegedly attacked him); *see also* Dkt. No. 24-1 at 4 ("This arrest report is

submitted Un Arrested.").   Without Alanis's release from the arresting officers'
custody, the second *Valencia* condition was not fulfilled.

Finally, it cannot be said that Alanis was "awaiting trial for a significant
period of time," as was the case for the three-week detainee in *Valencia*.  But the
"significant period of time" distinction was eased by the Fifth Circuit in *Brothers*,
where the decedent had been in a jail cell for "several hours," and still would have
been a pretrial detainee even if the incident had occurred "several hours earlier."
*Brothers*, 28 F.3d at 456; *see Jones v. McIntosh*, No. 4:15-CV-4462016, 2016 WL
4430481, at *5 n.2 (E.D. Tex. Aug. 22, 2016) (noting that *Brothers* "greatly
diminished" the "significant period of time" requirement set out in *Valencia*).
However, the *Brothers* decedent was processed and "already had been in detention"
at the time of his death.  Here, Alanis was injured while Martinez moved him into a
holding cell where he would presumably "cool off" prior to processing.  Rather than
"awaiting trial" in the cell, Alanis was going to await the book-in that would usher
him into pretrial detention.  Unlike the *Brothers* decedent or *Valencia* plaintiff,
Alanis had not "been in detention," and was not "awaiting trial" at the time of the
alleged excessive force.

Martinez emphasizes the *Brothers* court's rationale that an individual has
"surely" become a pretrial detainee after his transfer to a jail cell.  This reference is
not dispositive for two reasons.  First, Alanis's injuries occurred inside a holding
cell, but it can more properly be said that the injuries took place *during* his transfer
to the cell—not *after* he had been transferred and "left in the cell" by the arresting

officer.  *See Jones*, 2016 WL 4430481, at *5 (citing *Brothers*).  Second, to take the language as dispositive in this case would be to remove it from the broader context of *Brothers* as a whole.  Whether the decedent had been walked into a cell was not the only relevant fact to the *Brothers* court.  Instead, the court listed several conditions that, taken together, meant the decedent was a pretrial detainee—that he had been arrested earlier in the day, processed by the police department, and then transferred to a jail cell, all before he was transported to a separate facility and shot several hours after the initial arrest.  *Brothers*, 28 F.3d at 456.  This case is different.  Alanis was arrested, driven less than two miles to the jail, never processed, and then injured while being brought into a holding cell where he would await booking.  From arrest to injury, the entire episode took less than an hour.  Dkt. No. 18 at 2, 9.  Had Alanis been arrested, processed, and transferred to a jail cell, like the *Brothers* decedent, then it could fairly be said that he, too, had "surely" become a pretrial detainee.  But to accept Martinez's argument under the facts at bar would mean that officers could bypass the *Valencia* factors and extinguish an arrestee's Fourth Amendment protections simply by walking the arrestee into a holding cell after apprehension, rather than completing the arrest by booking him into the jail or even ensuring he was secured inside the cell.  The Court does not take the Fifth Circuit's carefully delineated standards to be read so broadly.

The rest of Martinez's arguments are also unpersuasive.  In *Ratliff v. City of Houston*, the primary case cited by Martinez, the court cited *Brothers* to note that "the point at which Constitutional protections for detainees shift from the Fourth

Amendment to the Due Process Clause . . . is the point at which an individual is placed into secure custody in a jail cell." No. H-02-3809, 2008 WL 910205, at *1 (S.D. Tex. Apr. 3, 2008). Alanis was injured while being brought into a holding cell—he had not yet been "placed into secure custody" in the cell when the alleged excessive force occurred, either "for one hour, or for weeks." *Id.*

Additionally, Martinez asserts that he must be given the "benefit of the doubt" as to whether the Fourth or Fourteenth Amendment applies in this case, since he is asserting qualified immunity. Dkt. No. 27 at 2. He has cited no authority which would mandate that determination. The qualified immunity doctrine protects law enforcement officials from being held to *standards of conduct* which are unsettled by the Supreme Court or controlling court of appeals at the time of the questioned conduct, but does not entitle them to application of their legal framework of choice. *See Valencia*, 981 F.2d at 1442-1447 (setting out standards to determine whether an individual is an arrestee or pretrial detainee, and rejecting the defendant officer's position, even though he was asserting qualified immunity).

While the Fourth Amendment typically applies "more appropriately to the actual incident of arrest," its protection does not end immediately upon apprehension, but once the three conditions first set out in *Valencia* are complete. Here, the conditions necessary for Fourth Amendment protection to end had not yet been satisfied when Alanis was injured. Alanis was still an arrestee at the time of the incident, entitled to protection from excessive force under the Fourth

Amendment.   Alanis's Fourteenth Amendment claim, made in the alternative, should be **DISMISSED.**

### 2. *Martinez's assertion of qualified immunity*

"When resolving qualified immunity on summary judgment, courts must determine (1) whether the facts, taken in the light most favorable to the party asserting the injury, show the officer violated a federal right and (2) whether the right was 'clearly established' when the violation occurred." *Winfrey v. Rogers*, 882 F.3d 187, 197 (5th Cir. 2018) (citation omitted).   "Once an official pleads qualified immunity, 'the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law.'"   *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 727 (5th Cir. 2018) (citation omitted); *see also Hart v. Texas Dep't of Criminal Justice*, 106 Fed. Appx. 244, 252 (5th Cir. 2004) (per curiam) (noting a genuine issue of fact barred a qualified immunity determination because "the parties disagree[d] about what, exactly, the defendant did"); *Chacon v. Copeland*, 577 Fed. Appx. 355, 360 (5th Cir. 2014) (per curiam) (agreeing with the district court's conclusion that "'Chacon has produced sufficient evidence to survive the Officer Defendants' motion for summary judgment' because disputes of material fact exist").   "[I]f resolution of [qualified immunity] in the summary judgment proceedings turns on what the defendant actually did, rather than on whether the defendant is immunized from liability . . ., and if there are conflicting versions of his conduct, one of which would establish and the other defeat liability, then the case is

inappropriate for summary judgment." *Sanders v. Abisoye*, No. 3:14-cv-2039-L-BN, 2016 WL 1376362, at *3 (N.D. Tex. Mar. 11, 2016) (quoting *Haverda v. Hays Cty.*, 723 F.3d 586, 599 (5th Cir. 2013)).

### a. Constitutional violation

"To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (citations omitted). "The second and third elements collapse into a single objective-reasonableness inquiry, guided by the following *Graham* factors: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Peña v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "[S]ince police officers are regularly forced to 'make split-second decisions' in volatile situations, courts should evaluate the officer's actions 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Baeza v. Becker*, No. SA-14-CV-659-XR, 2015 WL 6127190, at *8 (W.D. Tex. Oct. 15, 2015) (citing *Graham*, 490 U.S. at 396). Courts "judge the reasonableness of an officer's conduct 'objectively,' that is, without reference to the subjective intent or motivation that underlies the officer's conduct." *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 411 (5th Cir. 2009). "[T]he reasonableness of an officer's conduct under the Fourth Amendment is often a

question that requires the input of a jury." *Id.*

It is undisputed that Alanis was injured.  His claim hinges on the second and third elements of a Fourth Amendment claim—whether Alanis's injuries resulted directly and only from a use of force that was clearly excessive, and whether the force was clearly unreasonable.  *Peña*, 897 F.3d at 619.  The crux of Alanis's argument is that, while handcuffed and restrained in Martinez's grip, he was deliberately driven into a padded wall with sufficient force to break his hip.  He acknowledges that during transit he flinched and pulled away from an officer, as a result of the officer "grabbing him pretty bad," which caused Martinez to pick Alanis up in a "bear hug" and carry him inside.  Dkt. No. 24-2 at 12.  But Alanis alleges that he offered no active resistance inside the jail, and only was attempting to walk forward while in Martinez's grip.  *Id.* at 12–13, 37.  He contends that Martinez pushed him "hard" toward the cell, and ultimately rammed him into the cell's padded wall.  *Id.* at 14.  Alanis highlights the fact that he is a 5'6" man who weighed 120 pounds at the time of the incident; he contends he did not pose a significant physical threat to Martinez, a 6'0", 330-pound man surrounded by several other armed officers.  Dkt. No. 21 at 8.

Martinez tells a different story.  According to Martinez, as he was moving Alanis through the narrow cell doorway, the two men's legs became entangled; Martinez lost his balance and fell forward, accidentally driving Alanis into the wall.  Dkt. No. 18.  Martinez emphasizes that Alanis, despite being handcuffed, had not yet been searched for weapons, and it was important to move him into the cell

quickly.   Dkt. No. 23-28 at 60.   Further, Martinez alleges that Alanis was "squirming" and resisting in his arms once inside the jail, further contributing to Martinez losing his balance in the doorway.   Dkt. No. 24-19 at 59.   Accidental conduct would not amount to an excessive force claim under the Fourth Amendment.  *See Brower v. Cty. Of Inyo*, 489 U.S. 593, 596 (1989) ("[T]he Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct."); *Baskin v. City of Houston*, 378 Fed. Appx. 417, 418 (5th Cir. 2010).  Alanis acknowledges as much.  Dkt. No. 32 at 2.  Defendants assert that Alanis cannot show a violation of his constitutional rights based on the accidental conduct in this case, and therefore, Martinez is entitled to qualified immunity.

Both parties have submitted the jail surveillance videos and accompanying photograph stills in support of their version of events, and claim that the video evidence "speaks for itself."   The Court has reviewed all evidence in the summary judgment record, and summarizes the videos as follows:

- The sally-port video depicts Alanis, shirtless and handcuffed, being led by the arm to the police station, surrounded by several officers.  He is pushed a step forward as an officer "hands Alanis off" to Defendant Martinez, who is waiting at the sally-port door.  Defendant Martinez takes hold of Alanis's arm and begins leading him into the station. Alanis appears to flinch quickly.  Martinez lifts him up and carries him into the building.

- The entryway video shows Martinez lift Alanis off the ground outside following a rapid, jerking motion from Alanis. The door to the interior of the jail appears to be closing. Martinez carries Alanis into the building, and the two men proceed down a nearby hallway.

- Both cell videos, taken from two different angles, show Martinez and Alanis crashing against the cell wall. Martinez then turns Alanis around and secures him on the ground.

At the summary judgment stage, the Court must view all facts in the light most favorable to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003). A narrow exception may arise in the context of video evidence: "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Martinez contends that Alanis's version of events is blatantly contradicted by the two surveillance videos taken from inside the cell, and that, rather than view the evidence in Alanis's favor, the Court should view the evidence in the "light depicted by the videotape." *Brothers v. Zoss*, 837 F.3d 513, 517 (5th Cir. 2016).

But under the "demanding" standard for this exception, "a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden v. City of Fort Worth*, 880 F.3d 722, 729 (5th Cir. 2018) (citing *Ramirez*, 716 F.3d 374). In a recent

Fourth Amendment excessive force case, the Fifth Circuit rejected a defendant officer's argument that the plaintiff's version of the facts was belied by video evidence, stating, "the videos do not favor one account over the other and do not provide the clarity necessary to resolve the factual dispute presented by the parties' conflicting accounts." *Id.* The Fifth Circuit reversed the district court's granting of qualified immunity, finding that there were still disputed issues of material fact which precluded summary judgment.

After multiple viewings of the videos, the Court finds that the video evidence does not so clearly discredit Alanis's testimony that no reasonable jury could believe his account of events. A reasonable juror could interpret the videos as supporting either account of events. Therefore, the Court views the evidence in the light most favorable to Alanis, and declines to accept Martinez's argument that Alanis's claim is belied by the record as a matter of law.

In addition to the videos themselves, Alanis has produced several photograph stills from one cell video which he alleges show Martinez's feet were "separated, balanced, and unobstructed as he crouched and braced to smash Alanis into the wall." Dkt. No. 21 at 9; Dkt. No. 24-14. He also notes that, while Martinez says he lost his balance, there was "no attempt by Martinez to release Alanis to prevent him or Alans from falling or being injured." Dkt. No. 21 at 9. Alanis testified that he felt he was being "tackled" or "slammed" by Martinez. Dkt. No. 24-2 at 14, 37. He disagrees with Martinez's assertion that he resisted while being escorted to the jail. *Id.* at 37. Additionally, an expert witness report, describing the cell videos, asserted

that "it is more likely than not that Martinez did not lose his balance when taking Alanis into the padded room."  Dkt. No. 23-31 at 6.  Taken together, Alanis's evidence is sufficient to at least raise a genuine question of material fact as to Martinez's conduct.

Defendants assert that the same videos "plainly" show Martinez and Alanis's legs becoming tangled, causing the alleged accident.  Dkt. No. 18 at 17.  In addition to the videos, their evidence includes additional photograph stills, the report of another expert witness who agrees with the "accident" theory of the incident, Alanis's testimony, a sworn declaration by Martinez, and the findings of the internal investigation from the police department.  Dkt. Nos. 20-16, 20-17, 20-49, 20-11, 20-50.  In particular, Defendants' expert report interprets the video as showing Martinez's feet off balance outside the cell, then Martinez turning his left foot toward the direction of his alleged fall and extending his leg in what appeared to be an attempt to regain his balance.  Dkt. No. 20-50.

At this juncture the Court cannot weigh the evidence, choose the more compelling expert report's view of the facts, or resolve any factual controversy in Martinez's favor unless Alanis's story is clearly contradicted by evidence in the record.  *Grogan v. Kumar*, 873 F.3d 273, 279 (5th Cir. 2017); *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004); *see also James v. United States*, No. SA-12-CA-800-FB, 2013 WL 12106710, at *2 (W.D. Tex. June 24, 2013) ("In a battle of competing experts, it is not the role of the Court upon a motion for summary judgment to pick between these experts or pre-try the case.").  Here, the segment of the video which

Martinez asserts shows the two men's legs entangling is dark, fast-paced, and open to interpretation.  Compounding the ambiguity is that the "tangled legs" theory is not a consistent part of the summary judgment record.  The record contains multiple statements from Martinez about the incident.  Dkt. Nos. 20-1; 20-11 at 22; 23-28.  Of these, only the most recent makes specific reference to his legs tangling with Alanis's legs at the door as the cause for the alleged accident.  Dkt. 20-1 at 3. Martinez's initial written report stated: "During the process [Alanis] is resisting, and as I was escorting him into the padded cell which caused me to loose my balance.  I then escort the inmate into the floor[.]"  Dkt. No. 20-11 at 22.  Later, in his deposition, Martinez testified:

> I'm guessing my -- -- my legs – probably my legs gave out or something because that one time that I saw the video, I just seen my leg going. Like I guess the position I was in when I was coming in, I wasn't able to get balance or gain my balance.

Dkt. No. 23-28 at 59.  He also stated, "Somehow we just – I lose balance, and we both go against that padded wall, ended up falling, and I guess he started claiming he had an injury."  *Id.* at 55.  When asked whether Alanis's foot got between his foot and the door, causing the incident, he stated he did not know.  *Id.* at 59–60.  Later, in his declaration, Martinez said, "We had a slight collision and our legs entangled in the narrow doorway.  Somehow, we both lost our balance[.]"  Dkt. No. 20-1 at 3.

Two officers also stated in their communications to Chief Rodriguez after the incident that Martinez *escorted* Alanis to the floor of the padded cell.  Dkt. No. 20-11 at 14, 15 (emphasis added).  The supervisor completing a report on the incident likewise offered: "Detention officers had to physically restrain Alanis and ultimately

force him to the floor to control his actions." Dkt. No. 20-11 at 34.   None of these statements make reference to an accidental trip-and-fall.   The Internal Affairs Division report, making findings about the videos, similarly did not mention any entanglement of the legs, instead reporting that the men "cleared" the doorway together, and Alanis was then "taken to the ground." Dkt. No. 20-11 at 4–6.

Defendants assert that Alanis "admitted" to the trip-and-fall in his deposition.   Specifically, the following exchange took place:

Q:  Are your feet – as y'all enter the padded cell, are your feet on the ground or are you up in the air?

A:   Both.   As I can remember, both tripping – I'm kind of already tripping because he's like pushing me – at the same time, pushing me and picking me up at the same time.   That's how I felt.

Dkt. No. 20-49 at 23.   But Alanis's statement that *he* tripped is not inconsistent with his assertion that Martinez "tackled" him and pushed him into the wall.   Alanis testified that Martinez's force was causing him to stumble in the hallway and continuing into the cell doorway.   *Id*. at 22.   That Alanis would be tripping himself in response to Martinez's alleged conduct is not inconsistent with his claim of excessive force.   Nowhere in the testimony does Alanis admit that Martinez also tripped and fell.

The Court emphasizes that it does not weigh the evidence or measure the credibility of any witness's account at the summary judgment stage.   Rather, the Court concludes only that, on this record, Alanis's account is not belied by Martinez's evidence as a matter of law, and sufficient evidence exists to create a genuine dispute of material fact as to whether Martinez lost his balance in the cell

doorway, or whether he intentionally drove Alanis into the wall. Defendants have already acknowledged that the issue of whether Martinez acted intentionally is a material one. Dkt. No. 27 at 1. The Court agrees; the disputed issue of fact is material because if jurors believed Martinez's account, Martinez would be entitled to qualified immunity, but as described below, if jurors believed Alanis's account of events, Alanis could show a constitutional violation. *See Oporto v. Moreno*, 445 Fed. Appx. 763, 766 (5th Cir. 2011) ("An issue is material if its resolution could affect the outcome of the action.") (quoting *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002)).

"Where the evidence raises a genuine issue of material fact, courts 'assume plaintiff's version of the facts is true, then determine whether those facts suffice for a claim of excessive force under [the] circumstances.'" *Jackson*, 2015 WL 7566291, at *5 (citing *Wagner v. Bay City, Tex.*, 227 F.3d 316, 320 (5th Cir. 2000)). Assuming that Alanis's version of the facts is correct and Martinez *did* act intentionally, the three *Graham* factors could militate in favor of finding that Alanis's injuries resulted directly from a use of force that was clearly excessive, the excessiveness of which was clearly unreasonable. *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017). Defendants have not argued otherwise. First, the severity of the crime at issue was relatively minor, since Alanis was arrested for a misdemeanor offense, albeit one that encompassed a minor physical altercation with a family member. Second, from Martinez's perspective, it would be unlikely that Alanis posed an "immediate, significant threat" to the safety of the officers or others once inside the

holding cell, given that he was handcuffed from behind and firmly within Martinez's grip by the time of the incident.  And, under Alanis's version of events, he was not actively resisting while being moved into the holding cell, but only attempting to walk forward.  Even under Martinez's account that Alanis "squirmed" while en route to the cell, Alanis's behavior would not have risen to a level of resistance that could justify an intentional body slam with sufficient force to break Alanis's hip against the padded wall.  *See Newman v. Guedry*, 703 F.3d 757, 762 (5th Cir. 2012) (finding that, even under defendant officers' account that an arrestee "struggled and was noncompliant," the arrestee's "behavior did not rise to the level of 'active resistance' to justify the force used).  Perhaps most crucially, Defendants have not contended that, if Martinez *did* act intentionally as alleged, his conduct would have still been reasonable.  Defendants rest their argument on interpretation of the video evidence as showing that the incident was accidental, and have never suggested how Martinez's actions would not have been a constitutional violation if, in fact, intentional.

In all, the parties appear to have narrowed the contours of this claim down to the issue of whether the collision against the wall was accidental or intentional.  Dkt. Nos. 27, 32.  Qualified immunity presents a question of law to be determined by a court, but 'when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury.'"  *Heaney v. Roberts*, 846 F.3d 795, 802 n.3 (5th Cir. 2017) (citing *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006).  For example, summary judgment is inappropriate in Fourth Amendment

cases where there is a genuine dispute of material fact as to whether an officer's conduct was accidental or intentional. *Santibanes v. City of Tomball*, 654 F. Supp. 2d 593, 604 (S.D. Tex. Sept. 4, 2009) (denying summary judgment after finding sufficient evidence to create a dispute of fact as to whether an officer intentionally fired his weapon); *Kalimah v. City of McKinney*, 213 F. Supp. 2d 698 (E.D. Tex. 2002) (denying summary judgment upon finding that plaintiff had raised a genuine dispute of material fact as to whether shooting by officer was accidental or intentional). So too here, the evidence Alanis has submitted—in the form of the cell video surveillance footage, photograph stills, an expert report, and sworn testimony—is sufficient to raise a genuine issue of material fact as to whether Martinez's conduct was accidental or intentional. This satisfies Alanis's burden in rebutting the first prong of qualified immunity.

### b. Clearly established law

The second prong of qualified immunity asks whether the constitutional right at issue was "clearly established" when the violation occurred. *Winfrey v. Rogers*, 882 F.3d 187, 197 (5th Cir. 2018). "In order for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "In the excessive force context, a constitutional violation is clearly established if no reasonable officer could believe the act was lawful." *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018).

At the time of Alanis's injuries in February 2015, the law was clearly established that the permissible degree of force to be used by an officer "depends on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee." *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008). It was also clearly established in February 2015 "that it was objectively unreasonable for . . . officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp." *Trammell*, 868 F.3d at 343 (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000)).

To reiterate, whether Martinez's conduct was objectively unreasonable in light of clearly established law cannot be decided without a resolution of the fact issue as to whether he lost his balance in the cell doorway. *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993). But, assuming Alanis's account is correct, Martinez could have violated clearly established law by deliberately driving a much smaller, handcuffed individual who was restrained in his grip into a padded wall with sufficient force to break his hip, when the only resistance that had taken place was the individual pulling away from an officer's grasp. *Trammell*, 868 F.3d at 343; *see also Darden v. City of Fort Worth*, 880 F.3d at 731 (5th Cir. 2018) ("We have previously suggested that a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest."); *Watts v. Smart*, 328 Fed. Appx. 291, 291, 293–94 (5th Cir. 2009) (finding genuine issues of material fact precluded qualified immunity where unprovoked defendant

officers struck the plaintiff after he was restrained); *Cowart v. Erwin*, 837 F.3d 444, 454–55 (5th Cir. 2016) ("We have little difficulty concluding that in 2009, the time of the incident, it was well-established, in sufficiently similar situations, that officers may not 'use gratuitous force against a prisoner who has already been subdued'[.]"). Clearly established law provides that lesser forms of resistance, such as pulling away from an officer's grasp, do not justify any and all force in response. *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) (finding that a suspect pulling his arm out of an officer's grasp, without more, was insufficient to find an immediate threat to the safety of the officers to justify the amount of force used); *see also Whatley v. Coffin*, 496 Fed. Appx. 414, 417 (5th Cir. 2012) (excessive force claim would be available where the plaintiff had stopped resisting when force was used, or if officers use force far greater than that required for his arrest and out of proportion to his threatening behavior); *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) ("While the Fourth Amendment's reasonableness test is 'not capable of precise definition or mechanical application,' the test is clear enough that [the officer] should have known that he could not forcefully slam Bush's face into a vehicle while she was restrained and subdued.") (citation omitted). As above, Defendants have never asserted that, if Martinez *did* intentionally slam Alanis into the wall, his conduct would not have violated clearly established law—Defendants' argument is purely limited to reliance on Martinez's account that the collision was an accident.

In sum, a determination on whether Martinez's conduct was objectively unreasonable in light of clearly established law is precluded by the remaining

dispute of material fact. If the disputed issue of material fact were resolved in Alanis's favor, Martinez would not be entitled to qualified immunity as a matter of law. Summary judgment on this claim, therefore, is inappropriate. Martinez's Motion should be **DENIED**.[3]

## B. The City of Brownsville's Motion for Summary Judgment

Alanis has abandoned his (1) "failure-to-train" Section 1983 claim, (2) "failure-to-supervise" Section 1983 claim, (3) cause of action under the Texas Tort Claims Act, and (4) request for punitive damages. Dkt. No. 22 at 4. These claims, therefore, should be **DISMISSED**. Remaining are Alanis's claims that the City should be held liable: (1) because it maintained a municipal policy or custom of allowing excessive force in the city jail, (2) and because Police Chief Orlando Rodriguez ratified Martinez's conduct.

### 1. Unlawful policy, practice or custom

"Municipalities cannot be held vicariously liable for the actions of their officials." *Jauch v. Choctaw Cty.*, 874 F.3d 425, 435 (5th Cir. 2017) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692–93 (1978)). A municipality may only be held liable for acts "directly attributable to it 'through some official action or imprimatur.'" *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). At the

---

[3] The Court's analysis as to whether Alanis was an arrestee or pretrial detainee at the time of the incident was not dispositive in this recommendation. Under either standard, the same question of material fact would have precluded summary judgment at this time. Assuming that Alanis's allegations are true, in the Fourteenth Amendment context, "the Fifth Circuit has upheld the denial of qualified immunity in other cases that involved slamming a plaintiff against a wall." *Ryals v. El Paso Cty.*, No. EP-13-CV-289-PRM, 2015 WL 3540951, at *6 (W.D. Tex. June 3, 2015) (citing *Rankin v. Klevenhagen*, 5 F.3d 103, 105 (5th Cir. 1993)).

summary judgment stage, "a plaintiff making a direct claim of municipal liability must demonstrate a dispute of fact as to three elements: that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 395 (5th Cir. 2017) (citing *Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015)).

An official policy "can arise in various forms." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). Specifically, "[a]n 'official policy' is either a policy statement, ordinance, regulation, etc., that has been officially adopted by a policymaker, *or* a persistent, widespread practice of officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents the municipality's policy." *Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005) (emphasis added). But the practice "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Peterson*, 588 F.3d at 850 (quoting *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc)). "A pattern requires similarity, specificity, and sufficiently numerous prior incidents." *Davidson*, 848 F.3d at 396. Isolated incidents "will almost never" suffice. *Piotrowski*, 237 F.3d at 578. Instead, the plaintiff must point to "sufficiently numerous prior incidents" to prevail. *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989). And, "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the

specific violation in question." *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005). In the excessive force context, for example, if the force used in a cited incident was not unlawfully excessive, then the incident is not evidence of an unlawful practice. *James v. Harris Cty.*, 508 F. Supp. 2d 535, 543 (S.D. Tex. 2007) (finding the plaintiff's "unlawful custom" claim failed as a matter of law because the plaintiff had not presented evidence that the past instances of alleged excessive force "were in fact unjustified or excessive to the needs faced by the deputies involved").

Alanis argues that the City, "through its final policymaker and similar incidents, had a policy directly or through ratification, of allowing the use of excessive force by detention officers on prisoners." Dkt. No. 22 at 4. He asserts that excessive force by jailers is "the un-written rule, custom and policy of the Department," and that he "has been able to discover 15 incidents of excessive force during the 10 years prior to this incident." *Id.* at 8, 16.[4] According to Alanis, "jailers used the padded cell as a place to punish non-compliant inmates." *Id.* at 8. He has submitted the investigative files and video evidence related to each of the 15 incidents of alleged excessive force.

Six of the incidents unquestionably involved excessive force in the jail. Dkt. No. 28 at 5–7. Both parties note that the City's former chief of police disciplined jailers for two excessive force incidents that took place in 2005 and two excessive force incidents that took place in 2007. Dkt. No. 23-9 (disciplining officer for an

---

[4] Alanis's complaint initially cited 19 incidents of excessive force. Dkt. No. 5. In his responsive briefing filed after discovery, Alanis presented argument and submitted evidence as to 15 cited incidents. Dkt. No. 22.

"unauthorized throw down technique" in the padded cell), Dkt. No. 23-11 (disciplining officer for "unauthorized techniques" in the padded cell), Dkt. No. 23-15 (disciplining officer who used "excessive physical force on [an individual] who was handcuffed from behind in the padded cell"), Dkt. No. 23-5 (containing complaint of individual injured during book-in process). Similarly, an incident report from 2011 states that a detention officer "escalated the use of force." Dkt. No. 23-20 at 49. The detention officer submitted a notice of his intent to retire after the incident. *Id.* at 3. Finally, in 2012, Chief Rodriguez placed a detention officer on administrative leave pending an investigation into an apparent use of excessive force. Dkt. No. 23-22. The detention officer resigned in lieu of termination. *Id.* at 4. Whether officers used excessive force in the nine other cited incidents is debated by the parties, and both parties contend video evidence in the record supports their interpretation of the incidents.

Several incidents led to investigations into whether *detainees* had used force against jailers. Dkt. No. 19 at 17. But this is not necessarily dispositive as to whether the jailers involved used excessive force in those cases. For example, the George Alvarez incident from November 27, 2005, resulted in a similar investigation and Alvarez's state court conviction for assault on a public servant. Dkt. No. 20-36; *see generally Alvarez v. City of Brownsville*, 1:11-CV-00078 (S.D. Tex.). Years later, the Texas Court of Criminal Appeals exonerated Alvarez after video evidence of the incident surfaced and showed Alvarez to be actually innocent. *Id.* Alvarez won a $2 million jury verdict on his *Brady* claim against the City for its

withholding of the exculpatory video evidence, but his excessive force claim was dismissed as time-barred and never adjudicated on the merits.[5]  *Id.* at Dkt. Nos. 45, 124.  Similarly, Jose Lopez was charged with assault on a public servant stemming from a May 8, 2006, jail incident, but acquitted by a jury.  *See generally Lopez v. City of Brownsville*, 1:08-CV-00153 (S.D. Tex.).  His subsequent federal civil rights complaint against the City was voluntarily dismissed upon resolution between the parties.  *Id.* at Dkt. No. 55.  Alanis and the City dispute whether the videos from the Alvarez and Lopez incidents reflect excessive force by jailers.

In this case, however, the Court need not weigh in on each incident and assess all the cited fact-specific police conduct from 2003 to 2012.  Even assuming *arguendo* that all 15 incidents could be construed as episodes of excessive force, these incidents are not the "persistent, widespread practice" required to show that excessive force in the city jail was the "unwritten rule" and official policy in place at the time of Alanis's injuries.  *See Peterson*, 588 F.3d at 851 ("Nevertheless, assuming their truth, the incidents do not, on the basis of this record, tell us that the City maintained an official policy of condoning excessive force.").  Alanis cites 15 incidents ranging from 2003 to 2012.  Nearly three years passed between the time of the final cited incident in 2012 and Alanis's injuries in 2015.  There was a gap, then, where there is no evidence that the City permitted any excessive force in the jail.  At the outset, this lack of consistency calls into question whether the alleged

---

[5] While the *Brady* claim in *Alvarez* is troubling, Alanis cannot make out an unlawful custom "for any and all 'bad' or unwise acts, but rather must point to the specific violation in question."  *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).  Put differently, the relevant question for purposes of Alanis's claim would be whether Alvarez was the victim of excessive force.

policy was "so permanent and well settled as to constitute a 'custom or usage' with the force of law. *City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988).

Critically, the cited incidents must also be taken in broader context. *Peterson*, 588 F.3d at 851. According to Chief Rodriguez and Defendants, since at least 2011, the city jail has processed an average of 7,000 individuals each year. Dkt. No. 19 at 10, Dkt. No. 20-3 at 2. Alanis cites 15 incidents over a period of nine years, six of which were confirmed excessive force instances, and nine of which have been debated. To reiterate, the standard for Alanis's particular claim is not how egregious or unconstitutional each past isolated incident may have been, but whether sufficiently pervasive evidence exists to show an official municipal policy. If, at a facility that typically processes around 7,000 individuals each year, there were 6 confirmed incidents of excessive force and 9 debated incidents of excessive force, it does not appear that the alleged policy was "so common and well settled as to constitute a custom that fairly represents the municipality's policy." *Piotrowski*, 237 F.3d at 579.

Alanis contends that the incidents at least create a question of fact as to whether the jail had such a policy. Precedent within this circuit does not support that conclusion. *See, e.g.*, *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009) (affirming summary judgment for the city where the plaintiff cited 27 complaints of excessive force over the course of three years); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (concluding 11 incidents did not support a pattern of illegality in the City of Houston); *Cano v. Bexar Cty.*, 280 Fed. Appx.

404, 407 (5th Cir. 2008) (per curiam) (affirming summary judgment for the county where the plaintiff had pointed to "less than a dozen claims of excessive force during a 15-year time frame"); *but see Releford v. City of Houston*, No. 4:14-CV-2810, 2016 WL 774552 (S.D. Tex. Feb. 29, 2016) (denying summary judgment for the city where the plaintiff identified 99 instances of police shootings over a three-year period, and none of them were deemed unjustified by the police department).  The Fifth Circuit has clearly stated, that, "[t]o hold otherwise would be effectively to hold the City liable on the theory of respondeat superior, which is expressly prohibited by *Monell*."  *Peterson*, 588 F.3d at 852 (citing *Monell*, 436 U.S. at 694).

It is also relevant that, in six of the cited instances, either the City disciplined the officer involved, or the officer left the police force.  The record does not reflect a pattern of the municipality condoning every cited instance of excessive force.  *See, e.g.*, *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 541 (W.D. Tex. 2017) (finding the plaintiff stated a claim for an unlawful policy by alleging there were 21 instances of excessive force over 4 years, resulting in 14 deaths, and the police department did not classify any as unjustified); *see also Releford*, 2016 WL 774552.  Excessive force in the jail would not appear to be the "expected, *accepted* practice of city employees," if multiple detention officers faced repercussions for such conduct.  *Peterson*, 588 F.3d at 850 (emphasis added).  And, as the City notes, "Alanis has not cited a single prior incident of undisciplined excessive force in the city jail that occurred during the relevant time of 2011 through 2015, when Orlando Rodriguez served as police chief and Antonio Martinez served as a city jailer."  Dkt. No. 28 at

9.  The only two cited incidents from 2011 to 2015 resulted in detention officers leaving the department amid excessive force complaints about their conduct—not an acceptance of excessive force by the City that would have signified any municipal custom of exoneration.  Dkt. No. 23-20, Dkt. No. 23-22; *see also Walker v. Harris Cty.*, 477 Fed. Appx. 175, 179 (5th Cir. 2012) (per curiam) ("Absent summary judgment evidence that the deputy . . . had any knowledge of the alleged county policy of not disciplining deputies, it was impossible for Walker to establish the required causal link.").

Alanis has raised 15 possible incidents of excessive force in the jail—of which, six are confirmed, disciplined incidents, and nine are incidents debated by the parties.  The incidents are taken from a sampling of nine years, ending nearly three years before the facts underlying this cause of action took place.  No undisciplined incidents were cited from the time in which Defendant Martinez was employed with the department and Chief Rodriguez was the final policymaker.  The incidents occurred in the broader context of a city jail where around 7,000 individuals are processed per year.  These factors together lead the Court to conclude that Alanis has not produced sufficient evidence to withstand summary judgment on his claim that the city jail had an unconstitutional policy of excessive force in place at the time of his injuries.   The record does not evince a practice "so common and well-settled as to constitute a custom that fairly presents municipal policy."  *Piotrowski*, 237 F.3d at 579.

### 2. *Ratification by policymaker*

Separately from Alanis's claim that the City had an unwritten policy of excessive force, Alanis alleges that the City should be held liable because Chief Rodriguez ratified Martinez's conduct.  Dkt. No. 22 at 14.  "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."  *City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988); s*ee also Santibanes v. City of Tomball*, 654 F. Supp. 2d 593, 611 (S.D. Tex. 2009) ("[L]iability may also occur when the municipality's policymakers condone or otherwise adopt the creation of a custom by knowingly ratifying the illegal or unconstitutional actions of subordinate, non-policymaking employees.") (citation omitted).  A plaintiff must show that the policymaker knowingly approved constitutional violations uncovered during his investigation, or that the policymaker approved "manifestly indefensible" conduct.  *Covington v. Covington*, No. 4:13-CV-03300, 2017 WL 635502, at *8 (S.D. Tex. Feb. 16, 2017).  "[U]nless the subordinate's actions are sufficiently extreme—for instance, an obvious violation of clearly established law—a policymaker's ratification or defense of his subordinate's actions is insufficient to establish an official policy or custom."  *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009).

The Fifth Circuit has limited ratification claims to "extreme factual situations."  *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017).  In the most oft-cited example of a successful ratification claim, *Grandstaff v. City of*

*Borger*, "the entire night shift of the city police force converged" on an innocent person's ranch after a high speed chase in which officers "fired wildly" at a suspected misdemeanant. *Coon v. Ledbetter*, 780 F.2d 1158, 1162 (5th Cir. 1986). The officers "proceeded to direct hails of gunfire at anything that moved; although nobody except the police was ever shown to have fired a shot," killing the innocent rancher, and after the "whole series of abusive events, the officers' supervisors 'denied their failures and concerned themselves only with unworthy, if not despicable means to avoid liability.'" *Id.* The Fifth Circuit held that this "highly peculiar set of facts" could give rise to a ratification claim. *Id.* at 1161. By contrast, ratification claims consistently fail where plaintiffs focus on the police chief's defense of subordinates' actions after reviewing the incident at issue. *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 395-96 (5th Cir. 2017) (finding no ratification where the plaintiff argued the police chief "ratified the conduct of [defendant officers] when he reviewed Davidson's arrest and determined that there was no violation from which he could discipline the officers"); *see also Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010) (rejecting ratification where the city "defended the constitutionality and propriety of the actions taken by its officers, despite the finding of a prior panel of [the Fifth Circuit] that the officers' actions violated the Fourth Amendment."); *Medina v. Ortiz*, 623 Fed. Appx. 695, 701 (5th Cir. 2015) (per curiam) (finding no ratification where the police chief "accepted the officer's use of force report, refused to turn over evidence until the lawsuit was filed, and [defended] the deputies' actions").

It is undisputed by the parties that Chief Rodriguez is the relevant final policymaker in this case.  Dkt. Nos. 22, 28.  Alanis asserts that this case is an "extreme factual scenario" which could give rise to a ratification claim.  Dkt. No. 22 at 17.  He argues "that the final policymaker, Chief Rodriguez, approves, sanctions and ratifies excessive use of force by his jailers."  *Id.* at 16.

In his sworn declaration (the "Declaration"), Chief Rodriguez stated that he referred Alanis's complaint to the Internal Affairs Division for an investigation. Dkt. No. 20-3 at 6.  The sergeant overseeing the investigation then provided Chief Rodriguez with "an extensive report setting forth his findings that the injury was caused by an accident[.]"  *Id.*; *see* Dkt. No. 20-11.  Chief Rodriguez swore that he conducted "a careful review" of all the evidence, including "several viewings of jail cell videos," and "came to the firm conclusion that excessive force was not used by D.O. Martinez in this situation."  Dkt. No. 20-3.  The Declaration provides several factors in support of Chief Rodriguez's conclusion: (1) Alanis's "combative, uncooperative state" during transit and arrival at the police station, (2) Chief Rodriguez's view that the sally port surveillance video justified Martinez's decision to carry Alanis into the jail facility, and (3) his interpretation of the padded cell surveillance videos as showing Martinez losing balance and falling with Alanis against the wall, coupled with the fact that Martinez, to his knowledge, had no prior history of abusing detainees.  *Id.* at 5.

Chief Rodriguez did not defend "an obvious violation of clearly established law."  *World Wide St. Preachers Fellowship*, 591 F.3d at 755.  His approval of the

internal affairs investigation did not knowingly ratify unconstitutional conduct, or ratify "manifestly indefensible" conduct so as to constitute an "extreme factual situation."  Chief Rodriguez believed Alanis's injuries to have been accidental; he did not endorse the idea of Martinez intentionally and unjustifiably body-slamming Alanis into a cell wall.  *See Ledbetter*, 780 F.2d at 1161–62 ("[The policymaker] did not defend lawless conduct, and it is unreasonable to infer from his defense of his men a county policy approving reckless police behavior.").  As discussed at length above, this is not an "obvious" case, and reasonable jurors could differ in interpreting the surveillance videos that show how Alanis was injured.  Chief Rodriguez's interpretation accepted the credibility of Martinez and provided several reasons in support of doing so.  Dkt. No. 20-3 at 5.  Rather than a "rubber-stamp" on the results of the investigation, Chief Rodriguez's review of the videos and other evidence related to the incident suggests diligence in his review.  *Compare with Hobart v. City of Stafford*, 916 F. Supp. 2d 783, 797 (S.D. Tex. 2013) (noting the police chief's "unusual investigation" never considered whether the officer had acted reasonably); *Santibanes v. City of Tomball*, 654 F. Supp. 2d 593, 613-614 (S.D. Tex. Sept. 4, 2009) (noting that the police chief "elected not to view the dashboard video" of the incident in question).  Even if Martinez were ultimately found to have violated the Fourth Amendment, Chief Rodriguez's good-faith conclusions still would not subject the City to liability, since the Fifth Circuit's precedent "'does not stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior

can be assumed to have resulted from an official policy.'" *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009) (citing *Coon*, 780 F.2d at 1161); *see also Davidson*, 848 F.3d at 395 ("[T]he underlying conduct . . . while unconstitutional, was not sufficiently extreme to qualify for a finding of ratification."). "[G]ood faith statements made while defending complaints of constitutional violations by municipal employees do not demonstrate ratification." *Davidson*, 848 F.3d at 395.

The Court notes Alanis's contention that a material issue of fact remains because Chief Rodriguez also viewed videos of past incidents in his deposition and had "no objections," even though his predecessor as chief of police found excessive force had been used in those same cases. Dkt. No. 22 at 8–11. The implication is that, if Chief Rodriguez found no wrongdoing in those confirmed instances of excessive force, so too his finding of no wrongdoing in Martinez's case may be unsound. On the contrary, however, Chief Rodriguez testified repeatedly that he did not "have enough information" and expressed his hesitancy to offer an opinion about the past incidents. *See, e.g.*, Dkt. No. 24-3 at 150, 152. Further, notwithstanding Chief Rodriguez's perceptions of the videos shown to him during his deposition, the record indicates that he reviewed Martinez's conduct with the benefit of a full investigative file and reached his own good-faith determination as to what happened. Dkt. No. 20-11. It is also notable that in the one cited incident of excessive force that did take place during Chief Rodriguez's tenure, Chief Rodriguez placed the officer on administrative leave pending an investigation, and the officer resigned from the department. Dkt. No. 23-22 at 4, 11.

Alanis has not produced sufficient evidence to show an "extreme factual situation" in which the City's policymaker either knowingly ratified unconstitutional conduct, or ratified manifestly indefensible conduct. Neither of Alanis's claims against the City shows a genuine issue of material fact. The City's Motion for Summary Judgment, therefore, should be **GRANTED**.

## IV. Recommendation

For the reasons stated above, it is recommended that Martinez's Motion for Summary Judgment be **DENIED** and the City of Brownsville's Motion for Summary Judgment be **GRANTED**. It is further recommended that Alanis's Fourteenth Amendment excessive force claim, "failure-to-train" claim, "failure-to-supervise" claim, and cause of action under the Texas Tort Claims Act be **DISMISSED**. Alanis's Fourth Amendment excessive force claim against Martinez should remain.

## V. Notice to Parties

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996).

Signed on this 7th day of June, 2018.

_____
**Ignacio Torteya, III**
**United States Magistrate Judge**